UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

ANTHONY PAPETTI, *on behalf of all others similarly situated*,

                              Plaintiff,

                       -v-

RAWLINGS FINANCIAL SERVICES, LLC,

                              Defendant.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/25/16

15 Civ. 2933 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Anthony Papetti brings claims under the Fair Debt Collection Practices Act ("FDCPA") against Rawlings Financial Services, LLC ("Rawlings").[1] Papetti claims that Rawlings sent him a communication containing legally deficient warnings and advisories in the course of attempting to collect a debt owed by Papetti to Rawlings's client, Oxford Insurance Company ("Oxford"). Following discovery, Rawlings moved for summary judgment. For the following reasons, that motion is granted.

## I.  Background

      The Court briefly sets out the material undisputed facts and the relevant procedural history.

---

[1] Papetti also named "John Does 1–25" in the caption of the Complaint, but these unknown individuals and entities have not been subsequently identified.

A.      Facts[2]

The material facts are straightforward and undisputed. *See* Transcript of 7/12/16 Argument, at 7–8 (both parties agreeing that the facts are undisputed).[3]

In November 2014, Papetti filled two prescriptions at a Duane Reade pharmacy. JSF ¶¶ 4–5. Duane Reade submitted claims for payment to Oxford. *Id.* ¶ 6. Even though Papetti's Oxford insurance coverage had recently expired, Oxford mistakenly paid Papetti's pharmacy claims (minus applicable co-payments). *See id.* ¶¶ 1–2, 7–8.

At all relevant times, Oxford had a contractual relationship with Rawlings, pursuant to which it sent Rawlings its pharmacy claims data, and Rawlings then "mined" that data looking for "overpayments" of precisely this sort. *See id.* ¶ 9; Jacobs Decl., Ex. E ("Rawlings–Oxford Contract"), at RFS-0258 ("[Rawlings] will mine Oxford's pharmacy claims data to identify, investigate and recover potential overpayments due to coverage expiration.").

In due course, Rawlings discovered the Papetti overpayment. JSF ¶ 10. On January 21, 2015, Rawlings sent, on Oxford letterhead, a letter to plaintiff's father, Gerard Papetti, the Oxford account holder. *Id.* ¶¶ 1, 11; *see* Jacobs Decl., Ex. K ("1/21/15 Letter"). That letter—entitled "Audit Notice – Response Required"—advised that "Oxford is due reimbursement for claims paid after termination of coverage," and listed an "Amount Due" of $696.62. *See* 1/21/15 Letter.

---

[2] This summary is drawn from the parties' Joint Statement of Facts, Dkt. 68 ("JSF"), as well as the exhibits attached to the declarations of Barry Jacobs, Dkt. 75 ("Jacobs Decl."), and Benjamin J. Wolf, Dkt. 77 ("Wolf Decl.").

[3] This transcript is a preliminary copy obtained through the Court Reporters' Office and has not yet been publicly filed.

On February 6, 2015—*i.e.*, 16 days after Rawlings sent the initial notice to Papetti's father on Oxford letterhead—Rawlings sent the younger Papetti a letter on Rawlings letterhead. JSF ¶ 12; *see* Jacobs Decl., Ex. M ("2/6/15 Letter"). This time, the header announced: "Audit Notice – Account Overdue." The letter advised that "we have not yet received payment," and offered two methods by which payment could be made to "Oxford c/o Rawlings Financial Services LLC": (1) by having the pharmacy reverse its claims to Oxford and submit the claims to a different insurer, and then sending proof of such reversal; or (2) by reimbursing Oxford directly, and then submitting the claims to a different insurer. Further, the 2/6/15 Letter instructed that, if Papetti did not have insurance coverage in November 2014, he should contact Rawlings "to discuss the payment options available." This is the letter that Papetti claims violated the FDCPA.

**B.     Procedural History**

On April 15, 2015, Papetti filed the Complaint. Dkt. 1. On May 12, 2015, Rawlings filed a motion to dismiss, Dkt. 10, which the Court denied on August 5, 2015. Dkt. 29, *reported at Papetti v. Rawlings Fin. Servs., LLC*, 121 F. Supp. 3d 340 (S.D.N.Y. 2015). On August 20, 2015, Rawlings answered. Dkt. 37.

Following discovery, on May 31, 2016, Rawlings moved for summary judgment. Dkt. 69. In support, Rawlings filed a memorandum of law, Dkt. 74 ("Rawlings Br."); the Jacobs Declaration; and the affidavit of William Shircliff, Dkt. 70 ("Shircliff Aff."). On June 21, 2016, Papetti filed an opposition brief, Dkt. 76 ("Papetti Br."), and the Wolf Declaration. On July 5, 2016, Rawlings filed a reply brief, Dkt. 78 ("Rawlings Reply"), and a reply affidavit of William Shircliff, Dkt. 79 ("Shircliff Reply Aff."). On July 8, 2016, with leave from the Court, Papetti filed a sur-reply. Dkt. 83 ("Papetti Sur-Reply").

On July 12, 2016, the Court held oral argument.[4]

## II. Applicable Legal Principles

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

---

[4] Papetti has also filed two motions for class certification over the course of this litigation, *see* Dkts. 3 & 57, both of which have been held in abeyance pending discovery and the outcome of summary judgment. *See* Dkt. 63 (denying the latter motion without prejudice).

### III. Discussion

The FDCPA regulates the activities of "debt collectors" with the aim of "deterring deceptive conduct." *Jacobson v. Healthcare Fin. Servs. Inc.*, 516 F.3d 85, 91 (2d Cir. 2008). The term "debt collector" is statutorily defined. *See* 15 U.S.C. § 1692a(6). Among other things, it does not include "any person collecting or attempting to collect any debt . . . due another to the extent such activity . . . concerns a debt which was *not in default at the time it was obtained* by such person." 15 U.S.C. § 1692a(6)(F)(iii) (emphasis added).

In its motion for summary judgment, Rawlings argues that it was not acting as a debt collector when it sent the 2/6/15 Letter to Papetti because Papetti's debt was not "in default" at the time Rawlings "obtained" it. This argument requires pinning down two dates: the date when Rawlings "obtained" Papetti's debt, and the date this debt became "in default." If the former was earlier than the latter, summary judgment must be granted for Rawlings. The Court analyzes the two relevant dates in turn.

#### A. When Did Rawlings "Obtain" Papetti's Debt?

The word "obtained" is not defined in the FDCPA. One possible interpretation is that it refers to a transfer of ownership or an assignment. Another is that it includes "the possession of the right and responsibility to collect a debt." *Franceschi v. Mautner-Glick Corp.*, 22 F. Supp. 2d 250, 254 (S.D.N.Y. 1998). Courts in this Circuit have adopted the latter view, starting with Judge Cote's reasoned decision in *Franceschi*. *See id.* (citing, *e.g.*, *Wadlington v. Credit Acceptance Corp.*, 76 F.3d 103, 106–07 (6th Cir. 1996)); *Lautman v. 2800 Coyle St. Owners Corp.*, No. 13 Civ. 967 (ARR), 2014 WL 2200909, at *4 (E.D.N.Y. May 23, 2014); *Wood v. Capital One Servs., LLC*, No. 09 Civ. 1445 (NPM), 2012 WL 4364494, at *7 (N.D.N.Y. Sept.

21, 2012); *Kesselman v. The Rawlings Co., LLC*, 668 F. Supp. 2d 604, 611 (S.D.N.Y. 2009).[5] The Court does so, as well.

In this case, the undisputed facts establish that Rawlings had the right and responsibility to collect Papetti's debt *no later than* January 21, 2015—*i.e.*, when it sent the first letter to Papetti's father. At that point, Rawlings had mined Oxford's data and discovered Oxford's overpayment on Papetti's pharmacy claims. *See* JSF ¶ 10; Shircliff Aff. ¶ 21. Pursuant to its contract with Oxford, Rawlings was required not just to identify such overpayments, but also to "recover" them. *See* Rawlings–Oxford Contract, at RFS-0258; *see also* Jacobs Decl., Ex. I ("Hall Dep."), at 47 ("[Rawlings] is working on behalf of Oxford."); Wolf Decl., Ex. C ("Swann Dep."), at 62 ("Rawlings is attempting to collect $696.62 on behalf of Oxford."). The 1/21/15 Letter itself states that Oxford "asked Rawlings to process reimbursements due." The letter instructed the recipient either to contact a Rawlings representative to discuss re-billing or payment options, or simply to submit a check *to Rawlings*, payable to Oxford. *See* 1/21/15 Letter.

Thus, by no later than January 21, 2015, Rawlings had obtained Papetti's debt for purposes of the FDCPA.

### B.   When Did Papetti's Debt Go Into Default?

The Second Circuit has held that a debt is not "in default" merely because it is due. *See Alibrandi v. Fin. Outsourcing Servs., Inc.*, 333 F.3d 82, 86 (2d Cir. 2003). Instead, "only after some period of time does an outstanding debt go into default." *Id.* The Second Circuit has not

---

[5] *See also, e.g.*, *De Dios v. Int'l Realty & Investments*, 641 F.3d 1071, 1076 (9th Cir. 2011) ("obtained the right to collect"); *Hamilton v. Trover Sols., Inc.*, 104 F. App'x 942, 944 (5th Cir. 2004) ("obtained the responsibility to recover"); *Dantin v. Rawlings Co., L.L.C.*, No. 03 Civ. 116, 2005 WL 6075786, at *2 (M.D. La. Apr. 13, 2005) ("gains the right or responsibility to collect the debt").

6

identified this period of time, beyond observing that "default does not occur until *well after* a debt becomes outstanding." *Id.* at 87 (emphasis added). Of course, parties have "considerable leeway" to "contractually set the period of delinquency preceding default." *Id.* at 87 n.5. And, absent such a contractual provision, an entity's "self-identification as a debt collector . . . is strongly indicative that a debt was in default." *Panzer v. Alternative Claims Mgmt., LLC*, No. 15 Civ. 5383 (WHP), 2016 WL 3771251, at *3 (S.D.N.Y. July 8, 2016) (citing *Hooks v. Forman Holt Eliades & Ravin LLC*, No. 11 Civ. 2767 (LAP), 2015 WL 5333513, at *12 (S.D.N.Y. Sept. 14, 2015)); *see also Alibrandi*, 333 F.3d at 87–88.

In this case, the undisputed facts establish that Papetti's debt went into default *no earlier than* February 6, 2015, *i.e.*, when Rawlings sent the second letter, on its own letterhead, identifying itself as a debt collector and announcing that Papetti's account was "overdue." Before this point, Papetti's debt to Oxford was merely due—not in default. There can be no argument that Papetti's debt was in default on, say, January 21, 2015, because at that time he did not even know the "debt" existed. While in some metaphysical sense Papetti owed Oxford from the moment Oxford mistakenly paid his pharmacy claims in late 2014, from the perspective of the FDCPA, the debt could not be "due"—let alone "in default"—until, at a bare minimum, the debt had been identified by the creditor or its agent and made known to the debtor.

\*\*\*

Thus, putting these two holdings together: Rawlings obtained Papetti's debt no later than January 21, 2015, but the debt went into default no earlier than February 6, 2015—or, in any event, sometime during that 16-day window. Therefore, Rawlings "obtained" the debt while it was "not in default," and was not acting as a debt collector as defined by the FDCPA when it communicated about this debt with Papetti.

7

### C. Papetti's Counter-Arguments

None of Papetti's counter-arguments is compelling.

First, Papetti argues that Rawlings is simply not the type of company to which the "not in default" exemption was meant to apply. *See* Papetti Br. 18 ("[T]his exemption was created for 'mortgage servicing companies and others who service outstanding debts for others, so long as the debts were not in default when taken for servicing.'") (quoting S. Rep. No 382, 95th Cong., 1st Sess. 3, at 3). But the Second Circuit has squarely held that, "under § 1692a(6)(F)(iii), the classification of debt collector depends upon the status of a debt, rather than the type of collection activities used." *Alibrandi*, 333 F.3d at 86; *see also Wood*, 2012 WL 4364494, at *8 ("[I]n accordance with the legislative intent of the FDCPA, courts apply the exception to other types of companies besides mortgage service companies.") (collecting cases).

Second, Papetti argues that Rawlings was a debt collector simply because, in the 2/6/15 Letter, it identified itself as such. *See* Papetti Br. 20–21. Although the Second Circuit has held that an agent's self-identification as a debt collector is "relevant" to whether the debt was considered to be in default, *Hart v. FCI Lender Servs., Inc.*, 797 F.3d 219, 227 (2d Cir. 2015) (summarizing *Alibrandi*, 333 F.3d at 87–88), courts generally do not treat self-identification as sufficient, standing alone. *See Panzer*, 2016 WL 3771251, at *3 (relying on "other facts" besides self-identification); *Hooks*, 2015 WL 5333513, at *12 (court must consider self-identification "in the totality of facts of each particular case"); *Kapsis v. Am. Home Mortgage Servicing Inc.*, 923 F. Supp. 2d 430, 441 (E.D.N.Y. 2013) ("[A]lthough the Second Circuit has not held that the mere use of a 'debt collector' disclaimer automatically transforms a person into a debt collector for purposes of the FDCPA, the *Alibrandi* decision makes clear that certain actions may constitute a declaration that a plaintiff's debt was in default at a particular time even

8

if the debt was not technically in default."). Considering the full factual context here, Rawlings's mere self-identification as a debt collector in the 2/6/15 Letter does not create a triable issue of fact about whether Papetti's debt was in default at the earlier point (by January 21, 2015) when Rawlings obtained it.[6]

Finally, Papetti argues that Rawlings "stepped into the picture"—*i.e.*, obtained the debt—"only after Oxford's collection attempt [on January 21, 2015] was unsuccessful," and, thus, after the debt went into default. Papetti Br. 16 (emphasis added). This argument rests on the assumptions that (1) the 1/21/15 Letter was from Oxford, not Rawlings; (2) the debt went into default very shortly after that first letter was sent; and (3) Rawlings obtained the debt from Oxford *after* that.

There is no support—legal or factual—for any of these contentions.

First, the parties stipulated that *Rawlings* sent the 1/21/15 Letter, albeit on Oxford letterhead. JSF ¶ 11. Papetti argues that the Oxford letterhead makes the 1/21/15 Letter Oxford's. *See* Papetti Sur-Reply 1–2. This argument ignores the letter's content, which directs the recipient to contact and/or submit payment *to Rawlings*, not Oxford. *See* 1/21/15 Letter.

Second, Papetti's assumption that his debt went into default between January 21 and February 6 contradicts *Alibrandi*, which held that "default does not occur until well after a debt becomes outstanding." 333 F.3d at 87. Although Rawlings's customer-service representatives are told to inform callers that their debts are "considered in default" when "payment is not

---

[6] *Alibrandi* provides a useful contrast. There, plaintiff maintained that, before defendant was involved, the creditor had already declared the debt to be in default when a prior agent's communication specified that it was a debt collector, "contained the warnings and disclaimers required of debt collectors," and "underscored a change" in the creditor's approach to the debt. 333 F.3d at 87. The Second Circuit held that the subsequently retained defendant "had no ability" to change this default status. *Id.* at 88.

9

made," *see* Wolf Decl., Ex. E, there is no legal or factual basis on which Papetti may claim that this transformation, as to his debt, occurred almost instantaneously.

Third, even if that transformation occurred in the 16-day period between January 21 and February 6, there is no evidence that Rawlings "obtained" the debt *afterwards*. Aside from the purely formal change in letterhead, Papetti points to no evidence suggesting that a crucial transfer of responsibility from Oxford to Rawlings occurred in the 16 days between the first and second letters.[7] Instead, Papetti attacks the affidavits of William Shircliff, the president of the Rawlings pharmacy division.[8] *See* Papetti Br. 6–9; Papetti Sur-Reply 2. According to Shircliff, Oxford never informed Rawlings that Papetti owed Oxford any money, let alone that any such debt was in default. *See* Shircliff Aff. ¶¶ 18–19. Instead, Rawlings itself identified the overpayment, consistent with its contractual obligations. *See id.* ¶ 21; JSF ¶ 10; Rawlings–Oxford Contract, at RFS-0258. As Shircliff's knowledge of these matters was based on Rawlings's own business records, *see* Shircliff Reply Aff. ¶¶ 4–5, Papetti is flat wrong in asserting that such information could only be known by Oxford. *See* Papetti Br. 7. And Papetti has come forward with no other evidence about Oxford's dealings with Rawlings that might undermine the conclusion that Rawlings obtained the debt by January 21.

---

[7] At argument, Papetti maintained that Rawlings obtained the debt "[r]ight before they sent the second letter," but pointed to no concrete event at that moment. Tr. 11. Papetti, in effect, argued that the debt both went into default and was obtained by Rawlings at some point between the first and second letters, but offered no evidence or argument about which happened first. *See* Tr. 11–13.

[8] Papetti's contention that the Shircliff Affidavit failed to comply with 28 U.S.C. § 1746 is meritless. *See* Papetti Br. 6–7. That section sets forth the circumstances under which *unsworn* declarations will be considered acceptable substitutes for sworn declarations. The Shircliff Affidavit was sworn to before a notary. *See* Shircliff Aff. at 8.

## CONCLUSION

For these reasons, Rawlings's motion for summary judgment is granted. The Clerk of Court is respectfully directed to terminate all pending motions and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 25, 2016
       New York, New York